**THE CADLE COMPANY, Appellant,**

v.

**REGENCY HOMES, INC. and Gene Rutland, Appellees.**

No. 03–99–00318–CV.

Court of Appeals of Texas, Austin.

June 15, 2000.

William W. Rittenhouse, Rittenhouse & Savant, P.C., Austin, for Appellant.

Jack R. Crews, Baird, Crews, Schiller & Whitaker, P.C., Temple, for Appellees.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and YEAKEL.

## ON MOTION FOR REHEARING

BEA ANN SMITH, Justice.

The opinion and judgment issued herein on March 30, 2000 are withdrawn, and the following opinion is substituted in lieu of the earlier one.

Appellant, The Cadle Company (Cadle), brought suit against appellees, Regency Homes, Inc. (Regency) and Gene Rutland,[1] guarantor, for payment of three promissory notes. The case was tried to the bench. Finding that the notes had been paid and that Cadle did not own the guaranty, the trial court ordered that Cadle take nothing against either defendant. We hold that the take-nothing judgment is not sup-

ported by any of the grounds advanced and that the trial court erred in concluding that Cadle did not own the guaranty. We will reverse and remand to the district court for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

Regency, a now-defunct corporation engaged in homebuilding, executed three notes payable to Texas American Bank/Temple on October 11, 1988: one for $10,000, one for $25,062.19, and one for $88,977.60.[2] The notes all provided for variable interest rates that fluctuated according to the bank's prime rate. All three notes matured on April 10, 1989. Texas American Bank failed on July 20, 1989. Regency and Rutland do not dispute that the originals of these notes, signed by Rutland, were entered in evidence during the trial. Each note referenced a security agreement that no party was able to locate.

On March 4, 1988, Rutland, as president and sole shareholder of Regency, executed an unlimited personal guaranty of Regency's indebtedness to Texas American Bank; he agreed to guarantee "the prompt and full payment to Bank of all indebtedness and liabilities of all kinds which are now or hereafter may be owing to Bank [by Regency]." Rutland does not dispute that the original guaranty he signed was entered into evidence during the trial.

After Texas American Bank failed, the Federal Deposit Insurance Corporation (FDIC) transferred the bank's assets to Team Bank, which later merged with Bank One. Cadle purchased the three notes in question from Bank One on November 29, 1993. The loan sale agreement package contained Regency's three promissory notes and Rutland's original guaranty; it did not contain a security agreement. The

---

1. We will refer to appellees collectively as Rutland unless the narrative requires mention of Regency.

2. The principal of the $88,977.60 note had been reduced slightly to $88,873.26 by the time Cadle sued to collect on it.

notes were endorsed from the FDIC to Bank One, and from Bank One to Cadle. The endorsements were not challenged at trial nor are they challenged on appeal. None of the three notes was marked paid, in full or in part.

Believing that the notes were in default, Cadle demanded payment from both Regency and Rutland in June 1994. When appellees failed to respond, Cadle filed this suit in July 1994. Appellees waited more than three years to file an answer.

Following a bench trial, the trial court rendered a take-nothing judgment against Cadle and entered findings of fact and conclusions of law. In nine points of error, Cadle challenges nine of the findings of fact and all seven conclusions of law.

## STANDARD OF REVIEW

In seven of its nine points of error, Cadle challenges the legal and factual sufficiency of the evidence to support certain findings of fact by the trial. We attach to a court's findings of fact the same weight that we attach to a jury's verdict upon jury questions. *See Lawyers Sur. Corp. v. Larson*, 869 S.W.2d 649, 653 (Tex. App.—Austin 1994, writ denied). To review the evidence under a legal insufficiency or no-evidence point, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex. 1998). We will uphold the finding if more than a scintilla of evidence supports it. *See Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995). The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *See id.*

When reviewing the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if the evidence is so weak or so contrary to the overwhelm-

ing weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). We will not substitute our judgment for that of the trier of fact merely because we might reach a different conclusion. *See Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex.App.—Austin 1992, no writ).

## TAKE–NOTHING JUDGMENT

To collect on a promissory note, a plaintiff must establish: (1) the existence of the note in question, (2) the defendant signed the note, (3) the plaintiff is the owner and holder of the note, and (4) a certain balance is due and owing on the note. *See Commercial Serv. of Perry, Inc. v. Wooldridge*, 968 S.W.2d 560, 564 (Tex. App.—Fort Worth 1998, no pet.). Establishing the amount of interest owed can be problematic when the note in question contains a variable interest rate, as is the case in this dispute; the difficulty grows when the variable interest rate is indexed to the prime rate of a defunct bank. Even if the holder of the note succeeds in establishing the elements entitling it to collection, the debtor may defeat collection by asserting and proving the affirmative defense of payment. *See Southwestern Fire & Cas. Co. v. Larue*, 367 S.W.2d 162, 163 (Tex.1963). If the debt is secured by a lien on intangible property, such as a note receivable, and a creditor wishes to sue for a deficiency after foreclosing the lien, it must first give the debtor notice of the intent to dispose of the property and must dispose of the property in a commercially reasonable manner. *See* Tex. Bus. & Com.Code Ann. § 9.504 (West 1991).

The trial court's findings of fact and conclusions of law reveal several bases for its take-nothing judgment against Cadle. First, the trial court found that each of the three promissory notes had been paid or compromised in full. Additionally, the court held that Cadle did not prove that a certain balance was due on any of the promissory notes. Apparently the trial

court reached this conclusion because of the variable interest rate set forth in each note. Seemingly for the same reason, the trial court concluded that the notes were not, and never had been, negotiable instruments. Further, the court found that the defendants were not indebted to Cadle because a predecessor in interest had not disposed of collateral in a commercially reasonable manner. *See id.* Cadle attacks each of these conclusions and raises factual and legal sufficiency challenges to the underlying findings of fact. We address each ground that might support the take-nothing judgment. In reviewing the evidence we, like the trial court, are presented with a confusing and disjointed record of the transactions relevant to resolution of this dispute.

### I. Payment

■ Cadle's possession of the original notes, Rutland's acknowledgment that he executed them, and the fact that the notes were not marked paid, constituted prima facie proof that the notes remained unpaid. *See Naylor v. Gutteridge,* 430 S.W.2d 726, 731 (Tex.Civ.App.—Austin 1968, writ ref'd n.r.e.). Rutland raised the affirmative defense of payment, and the trial court found that all three notes had been paid. On appeal, Cadle contends that the evidence is legally and factually insufficient to support this finding. *See Larue,* 367 S.W.2d at 162 (defendant has burden to prove affirmative defense of payment); *Titlow v. Devine,* 650 S.W.2d 143, 144 (Tex.App.—Houston [14th Dist.] 1983, no writ) (defendants required to prove payment by preponderance of the evidence).[3]

We first address whether Rutland established that the $88,873.26 note held by Cadle had been paid. At trial, Rutland contended that the $88,873.26 note was

actually a renewal of an interim construction loan and had been paid by foreclosure on the collateral securing the loan. In 1985 Regency obtained an interim construction loan from Texas American Bank (the bank) in the original sum of $82,750 to finance construction of a house that Regency built at 410 Northcliffe Drive in Belton. In 1987 Regency sold the home, taking a note receivable from Jack and Donna Brown for $104,025 (the Brown note receivable). The $82,750 interim construction loan was not paid off at that time. Instead, Regency claims to have renewed the interim construction note plus interest in some amount approximating $88,000.[4] Regency pledged the Brown note receivable to the bank as security for this renewal note and for a $10,000 note that represented the accumulation of interest that Regency owed the bank on other indebtedness. The bank's release of lien securing the original $82,750 interim construction note, Regency's deed to the Browns, the Browns' Deed of Trust in favor of Regency, and Regency's transfer of lien in favor of the bank were all executed on November 17, 1987. All of these documents are in the record. What is not in the record is the security agreement or the note representing the renewal of the interim construction loan; we do not even know the principal amount of that note. But Rutland asked the trial court to believe, and the trial court apparently did believe, that this renewal of the interim construction loan was the $88,873.26 note held by Cadle. Rutland and the trial court further assumed that the $10,000 note held by Cadle was the same $10,000 note that was also secured by the Brown note receivable of $104,025.

---

3. Cadle also complains that Rutland failed to state distinctly the nature of each payment as required by Rule 95 of the Texas Rules of Civil Procedure and should not be allowed to prove payment. *See* Tex.R. Civ. P. 95. Cadle did not raise this complaint in the trial court and therefore has not preserved it for appeal. *See* Tex.R.App. P. 33.1.

4. Rutland never established the exact amount of this note. He did not dispute or affirm the $87,732.96 principal sum mentioned in the affidavit of Micki Healy that we later discuss.

According to Rutland, monthly payments from the Browns were deposited into Regency's bank account and then "swept" out by the bank to apply to Regency's indebtedness. Rutland did not introduce bank records to identify the account into which these deposits were made, how many payments were made, how much credit was applied to Regency's indebtedness, or which indebtedness was reduced by the credits. The transfer of lien executed by Regency in favor of the bank on November 17, 1987 stated that it was being made to secure indebtedness described in a security agreement of even date; that security agreement was never introduced into evidence. Nothing other than Rutland's vague recollections, which were contradicted, served to identify the indebtedness secured by the Brown note receivable or credited with payments from the Browns.[5] There is no evidence of how much credit was applied, when it was applied, or to which specific notes it was applied.

The next chapter in Rutland's narrative of payment comes after Texas American Bank failed in July 1989. At some point, General Financial Services (GFS) purchased Regency's interim construction loan on the Brown house, also acquiring the rights of a secured party to the Brown note receivable for $104,025. Because Regency had defaulted on the interim construction note, GFS foreclosed on the Brown note receivable in 1993. The affidavit of Micki Healy, account officer for GFS, stated that the Brown note receivable was accepted as payment in full for Regency's promissory note dated November 17, 1987 made payable to Texas Amer-

ican Bank in the original principal amount of $87,732.96.[6] After foreclosing on the Brown note receivable, GFS accepted from the Browns less than $90,000 in cash as payment in full on the $104,025 real estate lien note. It is this transaction that so upset Rutland, who testified that the Brown note receivable should have been sufficient to pay off both the interim construction loan of approximately $88,000 and the additional $10,000 note. It is GFS's compromise of the Brown note receivable that formed the basis for the court's ruling that a predecessor of Cadle had failed to comply with the commercially reasonable requirements of section 9.504 of the Code, a conclusion that we will later address.

We find that Rutland's testimony falls far short of establishing that the promissory note paid in full by compromise of the Brown note receivable is in fact the same note purchased by Cadle. The fact that the two notes have approximately the same original principal balance is not sufficient. Cadle introduced evidence that Regency executed a note payable to the bank on October 13, 1987, maturing April 11, 1988, in the original principal sum of $88,977.60; this note was secured by a second lien on 713 Chatham, not the Browns' property at 410 Northcliffe Drive. The $88,873.26 note held by Cadle was executed more than a month before the renewal of the construction loan for the Browns' house. Cadle established that the note it held could be traced back to an $88,997.60 note executed on October 13, 1987. Rutland testified that an interim construction note Regency renewed on No-

---

5. Ray Severn, the bank's president at the time, testified that all loans were cross-collateralized, and in that situation, "you take the largest, weakest loan, whatever you consider it to be, and that's just a judgment, and that's where you apply it." He testified that classified, or nonaccrual, notes would be paid first. This testimony does not help Rutland meet his burden of proving payment because Severn failed to specify which, if any, of the notes in question were classified notes and failed to identify notes to which payments were ap-

plied, how many payments were made, how much credit applied, and by how much these payments reduced the notes.

6. Healy's affidavit is the only evidence of the original principal amount of the interim construction loan for the Brown home that was renewed by Regency on November 17, 1987. Rutland did not affirm or dispute this amount.

vember 17, 1987, in an unspecified amount approximating $88,000, was paid by GFS's foreclosure of the Brown note receivable in 1993. Rutland assumed, and persuaded the court to assume, that the GFS note paid in 1993 was the same note held by Cadle. This evidence is insufficient to prove payment.

Here Rutland's presumption is defeated by the three notes introduced by Cadle: the first executed on October 13, 1987 in the original principal sum of $88,977.60 and secured by a lien on 713 Chatham; the second, a renewal of the first, executed April 11, 1988 in the same principal amount, with the same loan number and the same security; and the third a renewal note executed October 11, 1988, in the principal sum of $88,873.26 with the same loan number but a slightly reduced principal that was secured by contract rights of all sales of contract homes. This third renewal note, which matured April 10, 1989, is the note Cadle sued upon; it does not mention anywhere that it is secured by the Brown note receivable. The GFS affidavit strongly suggests that a different note, originating a month earlier with approximately the same principal balance, was paid by foreclosure of the Brown note receivable. Rutland never produced the renewal note executed on November 17, 1987; he never produced the security agreement that identified the indebtedness secured by the Brown note receivable; he could not establish the original principal balance, saying only that it was around $88,000 ($82,750 plus accrued interest). Apart from Rutland's undocumented and vague recollections, nothing supports the assumption that Cadle's $88,873.26 note is the note that was paid by foreclosure of the Brown note receivable in 1993. Although Rutland's testimony standing alone

is some evidence, having fully reviewed the record, we hold that the evidence supporting the trial court's finding that the $88,873.26 note was paid in full or discharged by compromise is so weak as to be clearly wrong and manifestly unjust.[7]

■ We hold that there is even less evidence to support the trial court's finding that the $10,000 note held by Cadle was paid in full or compromised. Rutland testified that the Brown note receivable that was intended to secure both the Brown interim construction loan and the $10,000 note was compromised in an amount that only satisfied the interim construction loan. Rutland complains that the $10,000 note *should* also have been paid, but was not. However, there is no testimony that GFS ever held the $10,000 note, and therefore, GFS could not have applied proceeds from the Brown note receivable to offset the $10,000 indebtedness.[8] Rutland never testified directly that the $10,000 note was paid. The suggestion that the Browns' monthly mortgage payments were deposited in an account and swept out to pay Regency's general indebtedness, without more, does not establish payment of any certain note in any certain amount.

■ Rutland's testimony regarding credits applied to the $25,062.19 note is also inadequate to meet his burden of proving the affirmative defense of payment. Rutland described a circumstance where the bank foreclosed on certain lots in the Oak Hills subdivision and arranged with Regency to build homes on the lots and sell them for the bank. According to the arrangement described, eighty percent of the profit that Regency would normally receive as the developer would be applied

7. There is also no evidence to support the trial court's finding that Cadle's $88,873.26 note was "renewed and extended" by the Brown note receivable. Indeed, Rutland testified that the Brown note receivable was a wrap note intended as collateral to secure payment of the interim construction loan. We sustain Cadle's sixth point of error.

8. Under section 9.504(b) of the Code, GFS would have to account to the debtor for any surplus. *See* Tex. Bus. & Com.Code Ann. § 9.504(b).

to its general indebtedness to the bank. Rutland testified that there were fifteen or more houses built under this arrangement, but he introduced closing statements from only three such sales. Rutland testified that the profits from these sales, which were all subsequent to the execution date of the $25,062.19 note, must have been applied to this indebtedness. However, there is no evidence that the proceeds from these three home sales were credited solely to the $25,062.19 note; there is no evidence of the profit Regency received from the sale of houses other than these three. There is evidence that the arrangement with Texas American Bank required Regency to obtain interim financing from the bank on each home built in the Oak Hills subdivision. This further obscures which indebtedness the profits from these Oak Hill sales might have offset. Although Rutland's testimony, plus the three closing statements, proves that the bank received some profits from Regency to apply to some of its indebtedness, there is no proof that profits in an amount sufficient to pay the entire $25,062.19 note plus interest were credited to that indebtedness. Rutland has failed to meet his burden of proving payment, and the evidence standing alone is so weak as to be clearly wrong and manifestly unjust.

Having found the evidence factually insufficient to support the trial court's conclusion that Cadle's three notes were paid or compromised in full, we hold that the take-nothing judgment cannot be supported on this ground. We sustain the relevant portions of issues two, three, four, five, six, and nine. Unless the trial court's take-nothing judgment can be sustained on a ground other than the affirmative defense of payment, it must be reversed.

## II. Certain Balance Due

 In addition to establishing that the principal on the notes remained un-

paid, Cadle must establish a certain balance was owing on each note. *See Bailey, Vaught, Robertson & Co. v. Remington, Inv., Inc.*, 888 S.W.2d 860, 866 (Tex.App.— Dallas 1994, no writ). Rutland asserted at trial, and asserts on appeal, that Cadle could not prove this element of its case because it could not establish the prime rate of the defunct Texas American Bank. The trial court apparently agreed and concluded that Cadle did not prove a certain balance was due and owing on each note. We hold that under applicable Texas law, a variable rate of interest, even if indexed to a defunct bank's prime rate, does not prevent the holder of such a note from establishing that a certain balance is due.[9] *See id.* In this circumstance, "the *trier of fact* should apply a 'reasonable' rate of interest, considering the facts of each case." *Remington*, 888 S.W.2d at 866 (emphasis added).

We understand the trial court's struggle in handling a note with a variable rate of interest that is tied to a defunct bank's prime interest rate. In *Amberboy v. Societe de Banque Privee*, the supreme court, answering a certified question from the United States Court of Appeals for the Fifth Circuit, held that a note with a variable rate of interest determinable only by reference to a bank's published prime rate is a negotiable instrument under the Texas Business & Commerce Code (the Code). *See* 831 S.W.2d 793, 797 (Tex.1992) (interpreting when a writing is a negotiable instrument under former section 3.106 of the Business & Commerce Code). Although the comment to former section 3.106 of the Code stated that an instrument was negotiable only if the sum certain to be paid was capable of computation "from the instrument itself without reference to any outside source," the supreme court overruled this "four corners" rule of

---

**9.** We note that Texas American Bank failed *after* these notes matured. From our review of the record, the notes provide for postmaturity interest at the "Highest Lawful Rate" as defined in the notes. None of the parties or the trial court relied on this interest rate, but we would invite the parties to consider on remand whether this obviates the need to supply a reasonable rate of interest in lieu of the defunct bank's prime rate.

negotiability. *Id.* at 794 (quoting comment 1 to former section 3.106 of the Business & Commerce Code). The court held that the *Amberboy* ruling promoted the Code's fundamental purpose to "simplify, clarify and modernize the law governing commercial transactions." *Id.* (quoting former section 1.102(b)(1) of the Business & Commerce Code). In so doing the court noted that when the Code was adopted, variable interest rates were unknown; since the 1980s, they have come to dominate modern commercial practices, and a construction of the Code that recognizes that commercial certainty can be accomplished by reference to some authority outside the writing itself "serves the purpose of the law of negotiable instruments, which is to make the instrument the functional equivalent of money." *Id.* at 796, 794–96.

The *Amberboy* court limited its holding to notes with a variable interest rate that "is readily ascertainable by reference to a bank's *published* prime rate." *Id.* at 797 (emphasis added). Rutland argues that *Amberboy* does not control this dispute because the interest rate of a failed bank is not published or ascertainable. We agree. However, the rationale of *Amberboy,* coupled with a revision to the Code concerning interest and the directive of a subsequent appellate court decision, compel us to hold that a variable rate of interest indexed to a failed bank's prime rate will not defeat a note holder's ability to prove a certain balance is due and owing.

▮ After *Amberboy* was decided, the legislature codified its rationale by adopting the following Code section addressing the calculation of interest:

> Interest may be stated in an instrument as a fixed or variable amount of money or it may be expressed as a fixed or variable rate or rates. The amount or rate of interest may be stated or described in the instrument in any manner and may require reference to information not contained in the instrument. If an instrument provides for interest, but the amount of interest payable cannot be

ascertained from the description, interest is payable at the judgment rate in effect at the place of payment of the instrument and at the time interest first accrues. . . .

Act of June 16, 1995, 74th Leg., R.S., ch. 921, § 1, 1995 Tex. Gen. Laws 4582, 4586–87 (Tex. Bus. & Com.Code Ann. § 3.112(b), since amended). Section 3.112(b) provides that if the amount of interest called for in the instrument is not ascertainable, interest is payable at the effective judgment rate. *See* Tex. Bus. & Com.Code Ann. § 3.112(b). *But see Wooldridge,* 968 S.W.2d at 565. According to the comments, the "fixed amount" requirement for a negotiable instrument set forth in section 3.104(a) of the Code applies only to principal; therefore, "if an instrument calls for interest, the amount of interest will *always* be determinable." Tex. Bus. & Com.Code Ann. § 3.112 UCC cmt. 1 (West Supp. 2000) (emphasis added).

▮ The rule in Texas is that courts should give a reasonable construction to the interest provisions in a promissory note. *See Petroscience Corp. v. Diamond Geophysical, Inc.,* 684 S.W.2d 668, 669 (Tex.1984); *Remington,* 888 S.W.2d at 866. In keeping with this rule, the court in *Remington* held that the holder of a variable interest rate note, originally payable to a bank that has subsequently failed, is entitled to a "reasonable" rate of interest in lieu of the prime rate of the defunct bank. *See Remington,* 888 S.W.2d at 866. The court reasoned that where the rate of interest is a term that is essential to a determination of the rights and duties of the parties, the trial court should imply a contract term to effectuate the intent of the parties. *See id; FDIC v. Cage,* 810 F.Supp. 745, 747 (S.D.Miss.1993). Here, the parties to the note agreed that interest would be payable on the note. It would be unreasonable to relieve Rutland of his obligation to pay interest because the parties failed to specify the interest rate to be applied upon the failure of the Bank. *See Cage,* 810 F.Supp. at 747. The court erred

in failing to imply a reasonable rate of interest to determine the rights and duties of the parties.

■■■■ By presenting the original notes, properly endorsed to Cadle and signed by Rutland, Cadle presented a prima facie case entitling it to collect the principal balance reflected on the notes. *See Naylor*, 430 S.W.2d at 731. The trial court did not allow Cadle to present evidence of a reasonable rate of interest, such as Wall Street prime, in lieu of the defunct bank's prime rate.[10] The trial court then concluded that Cadle had failed to prove that a certain balance was due in order to collect on the three notes. The trial court's finding that Cadle failed to establish a certain balance due could only be linked to Cadle's failure to establish the proper rate of interest owing on the three notes. Because it was incumbent on the trial court to provide a reasonable rate of interest, the court erred in concluding that Cadle could not prove a certain balance was due. We hold that such a conclusion is erroneous as a matter of law.[11] *See Remington*, 888 S.W.2d at 865; Tex. Bus. & Com.Code Ann. § 3.112(b) UCC cmt. 1 (interest is always determinable). We sustain appellant's ninth point of error challenging the conclusion of law that Cadle failed to prove a certain balance due and the conclusion that the notes are not negotiable instruments. Unless the trial court's take-nothing judgment is supported on a ground unrelated to Cadle's failure to prove a certain balance due, the judgment must be reversed.

### III. Commercially Reasonable Disposition of Collateral

■■ Another stated ground for the trial court's take-nothing judgment was the failure of Cadle, or its predecessors in interest, to give notice and to dispose of collateral securing the notes in a commercially reasonable manner as required by section 9.504 of the Code.[12] In its original petition, Cadle alleged that it had foreclosed on collateral and was suing for deficiencies. During trial, Cadle sought to amend its pleading to state that there were no valid liens securing the three notes and there had been no foreclosures. Defendants did not object to the late trial amendment, and it was filed after the trial concluded. At no time during the trial did Cadle refer to any collateral or attempt to prove up a deficiency. Lorna Vugrinovich, an account officer for Cadle, testified that given the price paid for the loan package, Cadle expected to receive collateral securing the notes but there was none. Vugrinovich testified that there were no liens securing any of the notes and there had been no foreclosures or repossessions. She testified that Cadle was suing for the balance due at the time the notes were purchased and not for any deficiency. At this point, Cadle offered its trial amendment, deleting the reference to foreclosures and deficiencies.

10. If properly admitted, evidence of a reasonable rate of interest should be allowed. However, even if evidence of a reasonable rate is not proffered, interest is always determinable. *See* Tex. Bus. & Com.Code Ann. § 3.112(b) UCC cmt. 1.

11. The three notes in question matured in April 1989, before the bank failed in July 1989. Presumably, the uncertainty about the failed bank's prime rate will affect only the post-maturity interest, which must be calculated as set forth in the notes.

12. The following are the portions of section 9.504 pertinent to this discussion:

(b) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency....

(c) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the methods, manner, time, place and terms must be commercially reasonable.

Tex. Bus. & Com.Code Ann. § 9.504(b) & (c).

Section 9.504 is a provision that gives the creditor an election of remedies. If the creditor forecloses on collateral, it may accept the collateral as payment in full for the indebtedness, but it must account to the debtor for any surplus. *See* Tex. Bus. & Com.Code Ann. § 9.504(b). However, if the collateral is insufficient and the creditor complies with the notice and "commercially reasonable" mandates of section 9.504, the creditor is entitled to the additional remedy of seeking a deficiency judgment against the debtor. *See id.* If a creditor fails to comply with the commercially reasonable standards and notice provisions of section 9.504, the creditor loses the opportunity to seek a deficiency judgment. *See id.*

Rutland testified that Regency's note receivable from Jack and Donna Brown in the amount of $104,205 "wrapped" two of Regency's notes payable to Texas American Bank, one in the approximate amount of $88,000, representing a renewal note for the interim construction financing on the Browns' house, and another in the exact amount of $10,000, representing interest Regency owed on other indebtedness to the bank.[13] There was evidence that the Brown note receivable was later acquired by GFS as security when it purchased Regency's interim construction note in a loan sale agreement in 1993. The trial court apparently concluded that GFS did not act in a commercially reasonable manner or give notice when it foreclosed on the Brown note receivable and accepted approximately $90,000 as payment in full from the Browns. This sum was sufficient to satisfy the $88,000 note, plus interest,

that GFS had acquired. Rutland alleged that this commercially unreasonable "compromise" deprived Rutland of the additional value from the Brown note receivable that might have been applied to the $10,000 indebtedness that it also secured. To establish an impairment of collateral under section 9.504, Rutland had to convincingly link the note held by GFS with the note sued upon by Cadle. Rutland failed to do this. As we held earlier, Rutland did not meet its burden of proving that the $88,000 note purchased by GFS was the same note sued upon by Cadle. Therefore, GFS's compromise of the Brown note receivable, whether or not it was commercially reasonable,[14] could not have affected Cadle's ability to collect the $88,873.26 note it had acquired.[15]

Most importantly, failure to comply with section 9.504 of the Code results in the inability to seek a deficiency judgment. Section 9.504 becomes irrelevant if this is not a suit for a deficiency. Cadle testified that it received no security for the three notes, did not foreclose on any collateral, and was not suing for any deficiencies. It amended its pleadings, without objection, to conform with these allegations. Under these circumstances, we hold that the trial court's take-nothing judgment cannot rest on any failure to comply with section 9.504 of the Code.

We overrule Cadle's legal insufficiency points of error because Rutland's testimony constituted some evidence that payment was made on the notes in question. However, we hold that the evidence is factually insufficient to support the conclusion that

---

13. It is undisputed that the $25,062.19 note held by Cadle was never secured by the Brown note receivable. Therefore, Rutland's claims regarding the commercial reasonableness of GFS's compromise of the Brown note receivable do not relate to the $25,062.19 note.

14. Because of the time value of money, notes paid in full before maturity are regularly discounted. Rutland offered no evidence that the present value in cash of the Brown note receivable at the time it was paid off exceeded

the discounted value accepted by GFS. Without such testimony, there is no evidence that the GFS's compromise of the Brown note receivable was not commercially reasonable.

15. GFS never held the $10,000 note also secured by the Brown note receivable and so could not have applied any additional proceeds to that indebtedness. Of course, the $25,062.19 indebtedness was not secured by the Brown note receivable.

the defendants established the affirmative defense of payment. Furthermore, we hold that the trial court erred in concluding that Cadle could not establish a certain balance due. Finally, we hold that section 9.504 of the Code does not affect Cadle's ability to collect on these unsecured notes and that the trial court erred in concluding otherwise. Therefore, we hold that there is no legal basis supported by the evidence for the trial court's take-nothing judgment.

## THE GUARANTY

▆▆▆▆ Cadle also challenges the trial court's conclusion of law that Cadle failed to prove that it owned Rutland's personal guaranty of Regency's indebtedness. The trial court's conclusion of law is not binding on this court, and we will independently evaluate the challenged conclusion. *See Westech,* 835 S.W.2d at 196. Conclusions may be reversed if they are erroneous as a matter of law. *See id.* Incorrect conclusions of law will not require reversal, however, if the controlling findings of fact will support a correct legal theory. *See id.* After reviewing the record, we determine that the trial court's conclusion that Cadle failed to prove that it owned the guaranty is erroneous as a matter of law and that under the controlling facts no other legal theory supports the trial court's conclusion that Rutland is not indebted to Cadle if Cadle otherwise establishes all the elements necessary to collect on the three notes.

Even according deference to the trial court's application of law to the facts, we are persuaded that the trial court failed to apply the law correctly to these facts. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig.proceeding). Cadle possessed the original guaranty and introduced it into evidence without objection. Rutland confirmed that he executed the guaranty in favor of the bank on March 4, 1988 and that it contained his signature. When Cadle purchased the three notes from Bank One, the loan sale agreement also conveyed all collateral documents, defined as follows:

"Collateral Documents" means all of the deeds of trust, mortgages, mechanic's lien contracts, security agreements, *personal guaranties,* corporate guaranties, pledges, collateral assignments, or other documents which specifically secure the performance or payment of any and all notes evidencing the Loans ... included in the Loan Package ..., and inuring to the benefit of the holder of the notes.

(Emphasis added.) According to the guaranty, Rutland guarantees payment of all Regency's existing or future indebtedness to Bank *or its assignees:*

If any customer's Obligations should be assigned by Bank, this guaranty will inure to the benefit of Bank's assignee to the extent of such assignment, except that Bank may first have recourse against such guaranty to the extent necessary to discharge any Obligations still owing to Bank by Customer.

Rutland relies on *Ashcraft v. Lookadoo* to argue that Cadle failed to prove ownership because it did not establish that Bank One owned a valid guaranty at the time it conveyed the notes to Cadle. *See* 952 S.W.2d 907, 912 (Tex.App.—Dallas 1997), *pet. denied per curiam,* 977 S.W.2d 562 (Tex.1998). In *Ashcraft,* the appellate court rejected the creditor's proposition that assignment of a note automatically assigns an underlying guaranty. *See id.* The court refused to *imply* a transfer of the guaranty and examined the facts to see if the assignee had established ownership. *See id.* at 913. The guaranty was not in the asset file that conveyed the note, and the assignee did not possess the guaranty, could not produce the original, or prove that the defendant had ever signed the original. *See id.* at 912–13. The copy of the guaranty was not specific to the note in question, and the assignee produced no evidence that the transferor of the note ever owned a valid guaranty capable of being assigned. *See id.* at 911–13. The appellate court found that those facts supported the trial court's finding that assignee failed to prove that he was the owner of the guaranty. *See id.* at 913–14.

Those were not the facts presented to the trial court below. Cadle possessed and presented to the court the original guaranty, which Rutland acknowledged having executed. The language of the guaranty specifically stated that it guaranteed all of Regency's existing or future indebtedness to the bank and was intended to benefit any assignee of the original bank. Finally, the loan sale agreement specifically conveyed to Cadle all collateral documents, which included personal guaranties. It was not necessary to imply a transfer of the guaranty on this evidence.

The facts of this case more closely resemble those of *Boyd v. Diversified Financial Systems* in which the appellate court affirmed the trial court's conclusion that the assignee owned the guaranty. *See* 1 S.W.3d 888, 890 (Tex.App.—Dallas 1999, no pet.). In reaching this result, the Dallas court distinguished its earlier decision in *Ashcraft* by highlighting the different factual circumstances. *See id.* at 893. In *Boyd* the guaranty was in the FDIC's file and was transferred to the plaintiff who, like Cadle, presented the original guaranty at trial. *See id.* In *Boyd,* the loan sale agreement conveyed all rights of the FDIC under any collateral documents. *See id.* at 892–93. Similarly, the loan sale agreement at issue here conveyed to Cadle all collateral documents, including guaranties. The *Boyd* court held that the facts presented were sufficient to establish the assignee's ownership of a guaranty. *See id.* at 893. Cadle's proof is even stronger, in that Rutland acknowledged executing the guaranty and the guaranty specifically expressed an intent to benefit assignees of the original bank.

The trial court below did not have the benefit of the more recent *Boyd* opinion. To the extent the trial court relied on *Ashcraft* to conclude that Cadle failed to prove ownership of Rutland's personal guaranty, we hold that it misapplied the law to the facts of this case. Applying the law to the controlling facts, we hold that Cadle proved that the guaranty was trans-ferred by the loan sale agreement and covered the three notes in question. We sustain the first issue.

## CONCLUSION

We hold that the evidence supporting the trial court's finding that the three notes were paid or compromised in full is so weak as to be clearly wrong and manifestly unjust. We further hold that Cadle is not precluded from proving a certain balance due because these notes contain a variable interest rate indexed to the prime rate of a defunct bank, and the trial court's conclusion to the contrary is erroneous as a matter of law. The trial court is required to provide a reasonable rate of interest to effectuate the intent of the parties. Additionally, we hold that the trial court erred as a matter of law in concluding that these notes were not negotiable instruments. We hold that the trial court erred as a matter of law in concluding that section 9.504 precludes Cadle from collecting on these notes. Finally, we hold that Cadle proved ownership of Rutland's guaranty. The judgment of the district court is reversed, and this cause is remanded for a new trial.

Justice YEAKEL not participating.