# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00712-CV

**Roundville Partners, L.L.C. and Quintana Development
Corporation, Appellants**

**v.**

**Stephen M. Jones and Frankie Sue Jones, Appellees**

## FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT
## NO. 98-198-C26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING

## O P I N I O N

After a sale of commercial real estate was not consummated, appellants Roundville

Partners, L.L.C. and Quintana Development Corporation (collectively "Roundville")[1] sued Stephen

M. and Frankie Sue Jones seeking specific performance of the commercial earnest-money contract.

Both parties moved for summary judgment, and the district court granted the Joneses' motion and

denied Roundville's motion. Roundville appealed to this Court and we reversed and remanded,

holding that a genuine issue of material fact existed. *See Roundville Partners, L.L.C. v. Jones*, No.

03-00-00724-CV, 2001 Tex. App. LEXIS 4970 (Austin July 26, 2001) (not designated for

---

[1] Quintana Development Corporation owns a seventy-percent interest in Roundville Partners,
L.L.C. and serves as Roundville's manager.

publication) [hereinafter "*Roundville I*"]. Following a bench trial, the district court rendered judgment in favor of the Joneses and ordered that Roundville take nothing. On appeal, Roundville claims that (1) there is legally and factually insufficient evidence to support the trial court's holding that Roundville was not entitled to specific performance; (2) there is legally and factually insufficient evidence to support several of the district court's findings of fact and conclusions of law, specifically its findings regarding the Joneses' affirmative defenses; and (3) there is legally and factually insufficient evidence to support the district court's holding that Roundville is not entitled to attorney's fees. We will affirm the judgment of the district court.

**FACTUAL AND PROCEDURAL BACKGROUND**

In June 1997, Michael Macs, the president and sole shareholder of Quintana, executed an earnest-money contract with the Joneses, through their real estate agent, Bob Elder, for the sale of 22.3 acres of land. The property, a platted subdivision known as the Henderson Tract Subdivision, is located in Round Rock, Texas, and consists of five lots. The property included a single house that straddled lots 1 and 4. The parties negotiated a purchase price of $1,800,000 based on an average valuation of $1.83 per square foot, with $360,000 to be paid in cash at closing and the balance of the purchase price to be financed by a long-term note payable to the Joneses ("contract one"). Prior to the closing date of December 31,1997, Elder approached Macs with a request from the Joneses to restructure the deal into two separate contracts ("contract two" and "contract three") to allow the Joneses to take advantage of the tax deferral for the sale of their primary residence. Contract two is a residential earnest money contract and contract three is a commercial earnest-

money contract.[2] The parties agreed to close the second contract on December 31, 1997.[3] The third contract was to close on or before January 30, 1998.

Under contract two, the Joneses agreed to convey the property containing their residence, consisting of all of lot 4 and approximately five acres of lot 1, for $560,000—approximately $1.83 per square foot.[4] Macs was to pay $360,000 in cash and execute a long-term note to the Joneses for $200,000.

On December 31, 1997, the parties met at Alamo Title Company to close contract two. Carolyn Stegall, the closing agent, informed Macs that because the portion of Lot 1 included in contract two was not surveyed, the title company would not issue a title commitment or title policy. Additionally, Macs discovered that a partial conveyance of Lot 1 might jeopardize the property's status as a platted subdivision and cause the property's value to decrease significantly. The parties agreed to modify the property description in contract two to encompass only Lot 4. Although the amount of the property to be conveyed was reduced, there was no adjustment to the purchase price. Consequently, at closing the Joneses received $560,000, an amount that exceeded the fair market value of Lot 4, which was approximately $68,000.

Because Roundville lacked sufficient cash to close contract two as originally agreed, the Joneses agreed to restructure the financing for the $560,000 purchase price. As a result,

---

[2] Contract two and contract three do not contain any references to each other.

[3] The Joneses needed to close contract two on December 31, 1997, because they had planned to use the proceeds of the sale in a simultaneous closing on a new house.

[4] It was the intent of the parties that contract two would convey $560,000 worth of land at $1.83 per square foot, maintaining the price per square foot established in contract one.

Roundville paid the Joneses $331,537.17 in cash, rather than the $360,000 originally contemplated. Roundville executed a long-term note for $200,000 to the Joneses as originally agreed and executed a second promissory note to the Joneses for $6,862.83, payable on or before January 13, 1998.[5] Both Macs and Elder testified that the understanding of the parties at the time contract two closed was that contract three would close within a couple of weeks, enabling Roundville to pay the $6,862 contemporaneously with the closing of contract three.

Consistent with the changes made to contract two, the parties modified the property description in contract three to encompass Lot 1 in its entirety, along with Lots 2, 3, and 5. Section nine of the contract required that the parties close the sale on or before January 30, 1998. Further, in section twenty-three, the parties agreed that "time is of the essence."

Stegall had closing documents prepared on January 23, 1998, with an anticipated closing to be held on January 30, 1998. Included in these documents was a HUD settlement statement that showed the Joneses would need $15,000 at closing. Stegall testified that she was informed by the Joneses that they did not have the cash to close. Stegall told Elder, who immediately called the Joneses and confirmed that they did not have sufficient funds to close by January 30, 1998.

Mr. Jones denied telling anyone that he lacked the funds to close, although in his earlier deposition testimony he stated that he could not remember whether he told anyone that he

---

[5] In order to facilitate the closing in light of the cash shortage, Elder agreed to take his commission in the form of two notes—one from the Joneses and one from Roundville in the amount of $21,600. This note, coupled with the $6,862.83 note to the Joneses, covered the cash shortage of $28,462.83.

could not close on contract three because of a cash shortage. He also admitted that he did not then possess the money necessary to close, but claimed he could have borrowed the money from relatives.

Meanwhile, the due date on the $6,862 note from Roundville had passed. The Joneses told Elder they wanted payment on the note. Elder called Macs to inform him that the Joneses were looking for payment on the second note. Macs expressed concern about giving more money to the Joneses before contract three closed and wanted to tie the payment of the $6,862 note to the closing on contract three, either by crediting the note against the amount the Joneses owed at closing or by tendering the check to them at the closing. The Joneses refused this because they regarded the $6,862 note as a separate obligation under contract two, and unrelated to contract three. Mr. Jones testified that he viewed Macs's attempt to tie the payment of the note to the closing on contract three as an attempt to "blackmail" him to close.

The closing on contract three did not take place in January 1998. Stegall, Elder, and Macs all testified that their understanding of why contract three did not close in January was that the Joneses needed more time because they lacked sufficient funds to close. The Joneses, however, testified that the reason contract three did not close was because they were never told an exact date and time for the closing and they were never provided a closing statement showing how much money they needed to close.

After the original closing date of January 30, 1998 passed, Macs, Elder, and Stegall all testified that they were under the impression that the closing deadline would be extended. Elder asked Stegall to prepare an addendum to the purchase agreement extending the closing date. Stegall prepared the extension and sent it to Elder, who then contacted the Joneses. Elder testified that he

5

believed they were proceeding forward. Both Elder and Macs signed the extension. The Joneses, however, never signed the extension.

At some point after January 30, the Joneses hired Rick Akins to collect the amount owed them on the $6,862 note from Roundville. Meanwhile, both parties made several subsequent attempts during the spring to close contract three. Closing dates were set for February 27 and then again for March 3, but the parties did not consummate the sale on either of those dates. On March 20 by a letter to Akins, Roundville demanded that the Joneses close contract three no later than March 27, 1998, at 5:00 p.m. On March 27, Roundville notified Akin that the closing was set for that day at 4:00 p.m. Macs and Elder arrived at Stegall's office for the closing, but the Joneses did not attend. At that time, Macs signed the deed of trust and accompanying real estate lien note. Another closing date was set for April 10, but that also did not take place. Akin then scheduled a closing date for April 17, which was later delayed to April 20. This attempt to close contract three was also unsuccessful.

As a result of the failure to close contract three, Roundville filed suit against the Joneses in May 1998 to compel the Joneses to convey the remainder of the property as required under contract three. Both parties moved for summary judgment. Roundville moved for summary judgment on the issue of specific performance. In support of their motion for summary judgment, the Joneses claimed, among other things, that Roundville had failed to tender performance and the contract had expired under its own terms. In June 1999, the district court rendered judgment granting the Joneses' motion and denying Roundville's motion. Roundville appealed to this Court, which reversed the trial court's summary judgment, finding that a genuine issue of material fact

6

existed concerning the Joneses' actions and whether they prevented Roundville from complying with the terms of the third contract. *See Roundville I*, No. 03-00-00724-CV, 2001 Tex. App. LEXIS 4970.

Meanwhile, in May 1999, Roundville declared bankruptcy. Roundville attempted to recover all monies conveyed to the Joneses under contract two that exceeded the fair market value of Lot 4, asserting that such amount was a fraudulent transfer under federal and Texas law.[6] *See* 11 U.S.C.A. § 548(a)(1)(B)(i), (ii)(I) (West Supp. 2003); Tex. Bus. & Com. Code Ann. § 24.006(a) (West 2002). After a bench trial, the bankruptcy court rejected Roundville's fraudulent-transfer argument. Roundville, however, did obtain a discharge of its obligation under the $200,000 note to the Joneses to the extent that it exceeded the fair market value of Lot 4, apparently because the Joneses did not file a proof of claim.

In June 2002, this case was tried to the court. After a bench trial, the district court rendered judgment in favor of the Joneses and against Roundville. It is from this judgment that Roundville now appeals.

## DISCUSSION

### *Standard of Review*

When the trial court acts as a fact finder, we review its findings under the legal and factual sufficiency standards. *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000). When we review legal

---

[6] A transfer may be fraudulent if a debtor made the transfer without receiving a reasonably equivalent value in exchange, and the debtor was insolvent or became insolvent because of the transaction. 11 U.S.C.A. § 548(a)(1)(B)(i), (ii)(I) (West Supp. 2003); Tex. Bus. & Com. Code Ann. § 24.006(a) (West 2002).

7

sufficiency, we review the evidence in a light that tends to support the finding of the disputed facts and disregard all evidence and inferences to the contrary. *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). If more than a scintilla of evidence exists, it is legally sufficient. *Id.* More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Id.* at 782-83.

In reviewing a factual sufficiency issue, we conduct a neutral review of all the evidence. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We reverse the ruling for factual insufficiency of the evidence only if the ruling is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Id.* We will not substitute our judgment for that of the trier of fact merely because we might reach a different conclusion. *The Cadle Co. v. Regency Homes, Inc.*, 21 S.W. 3d 670, 674 (Tex. App.—Austin 2000, pet. denied).

### *Specific Performance*

In its first issue, Roundville claims that the evidence was legally and factually insufficient to support the trial court's holding that it was not entitled to specific performance. Roundville first claims that it was entitled to specific performance based on the decision by this Court in *Roundville I*, where we held that Roundville must show at trial that it was prevented from tendering performance by the Joneses. *Roundville I*, No. 03-00-00724-CV, 2001 Tex. App. LEXIS 4970. Roundville claims that it established conclusively that the Joneses prevented it from tendering performance by not performing several of their obligations under contract three. Specifically, Roundville argues that the failure of the Joneses to execute a warranty deed prevented it from

8

executing a real estate lien note. Further, Roundville argues that the Joneses prevented a closing date from being set by causing all persons involved with the closing to believe that they lacked money to close and wished to extend the closing deadline.

As this Court discussed in *Roundville I*, specific performance is an equitable remedy that rests in the discretion of the court. *Scott v. Sebree*, 986 S.W.2d 364, 370 (Tex. App.—Austin 1999, pet. denied); *Nash v. Conatser*, 410 S.W.2d 512, 519 (Tex. Civ. App.—Dallas 1966, no writ). This Court has previously acknowledged that this equitable remedy is frequently granted when a valid contract to purchase real property is breached by the seller. *Scott*, 986 S.W.2d at 370 (citing *Kress v. Soules*, 261 S.W.2d 703, 704 (Tex. 1953)). A decree of specific performance is not a matter of right even to enforce terms of a contract, but is "a matter of grace" in the discretion of the court. 14 *Powell on Real Property* § 81.04[1][c] (Michael Allan Wolf ed., 2000).

In *Bell v. Rudd*, the supreme court held, as a fundamental matter, that before a grantee or obligee may assert any rights under an escrow contract he must show that he has complied with the conditions of the escrow, *i.e.*, actually tendered performance, or has offered to perform and was *prevented* without fault of his own. 191 S.W.2d 841, 844 (Tex. 1946). In cases where the seller's and buyer's contract obligations are mutual and dependent, in that a deed is required to be delivered upon tender of the purchase price, the purpose of a tender satisfies two purposes. First, a valid tender of the purchase price invokes the seller's obligation to convey and places him in default if he fails to do so. Second, the tender satisfies the fundamental prerequisite of specific performance—that the buyer show that he has done or offered to do, or is then ready and willing to do, all the essential and

9

material acts which the contract requires of him.**⁷** *Wilson v. Klein*, 715 S.W.2d 814, 821 (Tex. App.—Austin 1986, writ ref'd n.r.e.) (citing 4 *Pomeroy's Equity Jurisprudence* § 1407, p. 1050 (5th ed. 1941); 17 Am. Jur. 2d §§ 63, 64, pp. 91-92 (1973); annot., 79 A.L.R. 1240 (1932)).

In *Wilson*, this Court contemplated under what circumstances an actual tender is required or when a constructive tender will suffice. *Id.* In general, actual tender is a prerequisite to obtaining the remedy of specific performance. However, when actual tender would have been a useless act, an idle ceremony, or wholly nugatory, constructive tender will suffice. *Id.* at 822. For example, when a seller has conveyed the property to a third person, actual tender by a buyer is unnecessary. *Id.* However, when the contract specifies that "time is of the essence," as this contract does, there is a more particular rule that applies. *Id.* "In such cases, the buyer 'must make an actual tender of the price and demand of the deed' *within the time allowed by the contract*." *Id.* (quoting 4 Pomeroy, *supra*, at 1052). When time is of the essence in a contract, a party must perform or tender performance in strict compliance with the provisions of the contract and within the time prescribed in order to be entitled to specific performance. *Id.* (citing *Liedeker v. Grossman*, 206 S.W.2d 232, 234-35 (Tex. 1947)).

Where one party claims that it was prevented from tendering actual performance in strict compliance within the prescribed time, as in this case, *Ratcliffe v. Mahres* is instructive. 122 S.W.2d 718, 721 (Tex. Civ. App.—El Paso 1938, writ ref'd). In *Ratcliffe*, the court of appeals considered a suit for specific performance on a contract to convey an undivided interest in an oil well

---

**⁷** The term "tender" means to notify the other party that one intends to perform one's side of the bargain immediately or at a specific time and place and to demand that the other party do likewise. *Perry v. Little*, 419 S.W.2d 198, 200-01 (Tex. 1967).

and certain oil leases. *Id.* The court noted that the language of the contract, as well as the nature of the transaction, indicated that time was of the essence. *Id.* The court then stated that for Ratcliffe to obtain specific performance, he had to show that he had complied with the contract obligations, or that compliance was prevented by Mahres, attributing the rule governing these circumstances to Pomeroy's treatise, *Equity Jurisprudence*. *Id.* at 721-22. After reviewing the evidence concerning Mahres's conduct and noting that Ratcliffe had not produced evidence of facts sufficient to excuse his non-performance, the court concluded that Ratcliffe was not entitled to specific performance. *Id.* at 722.

It is undisputed that Roundville did not actually tender performance on this contract within the time specified—January 30, 1998. Because Roundville conceded that it did not actually tender performance, it had the burden to prove at trial that it was prevented from tendering performance by the actions of the Joneses. In *Roundville I*, we held that a genuine issue of material fact existed as to whether or not the Joneses prevented Roundville from tendering performance. *Roundville I*, No. 03-00-00724-CV, 2001 Tex. App. LEXIS 4970 at *29-31. Roundville asserts that it has satisfied the prerequisite of tender because, at all times it has been ready, willing, and able to tender performance on contract three but was prevented from doing so by the actions of the Joneses. Roundville claims that the Joneses failed to fulfill their obligations in the following ways: (1) failure to execute a warranty deed and prepare other necessary documents; (2) failure to obtain a right of first refusal from GTE;[8] and (3) failure to pay property taxes.

---

[8] GTE had a lease on the property to be conveyed under contract three that included a right of first refusal on any offer to purchase the property. The Joneses were required to obtain a waiver of this right at closing.

Macs testified that all Roundville needed to do to close was show up and sign a real estate lien note and deed of trust. He said that when he stopped by the title company in late January there was a draft of a note and deed, but they were incomplete, missing dates and some addresses. Stegall told him that they would be filled in at the closing, which was not yet scheduled. Macs testified that he was in constant contact with Stegall to arrange for a closing date, yet a closing was never scheduled in January. However, a closing was scheduled at least six times after the January 30 closing date specified in the contract. Further, while Macs was in contact with the title company, he never contacted the Joneses to offer or demand to close on or before January 30.[9]

The Joneses testified that the reason a closing was not scheduled in January was because they were not provided with a closing statement indicating what they needed in order to close. They also indicated that they were never told a time or place when closing would occur. Mr. Jones testified that he never told anyone that he did not have enough cash to close. He indicated that while he did not personally have sufficient funds, he had the ability to borrow what was needed from a family member. He claimed that he could not do so until he was provided a closing statement showing him exactly how much he needed.

It is clear that neither party involved made an explicit request or demand that the contract close in January. The Joneses did not schedule a closing, nor did Roundville. The Joneses allowed the closing date to come and go without any affirmative action on their part to ensure that contract three closed by January 30. They claimed that they were waiting for the title company to

---

[9] Macs also testified that he was told that there would not be a closing in January because the Joneses did not have sufficient funds to close; however, this information was provided by Stegall or Elder, not the Joneses.

provide them with a closing statement and for notification of when and where the closing would take place.  The Joneses were not in default under the contract prior to or on January 30, at which time the contract expired by its own terms.  We cannot say that the inaction on the part of the Joneses rises to the level of affirmatively preventing Roundville from tendering performance.

Roundville claims that it was prevented from executing a real estate lien note because of the failure of the Joneses to execute a deed conveying the property.[10]  However, Roundville did execute a lien note without a deed on March 27, 1998.  On March 20, Roundville demanded that the Joneses close contract three by March 27 at 5:00 pm.  Roundville set the closing for March 27 at 4:00 p.m., notifying the Joneses through Akin.  Roundville then went to the title company and executed all the documents necessary for closing, even though the Joneses were not present and did not furnish the documents called for in contract three, specifically the deed conveying the property.  There is no evidence that Roundville could not have done the same thing on or before January 30, 1998.  The Joneses' actions or inactions did not prevent Roundville from tendering performance in March.  There is nothing in the record that explains why Roundville could not have executed the necessary documents to close in January.

The evidence surrounding the events leading up to the attempted closing of contract three is not disputed.  Roundville did not set a closing or demand that one be set on or before January 30.  Neither did the Joneses.  Neither party went to the title company to tender performance of their

---

[10] Roundville also claims that the Joneses failure to pay property taxes and obtain a right of first refusal from GTE prevented it from tendering performance.  This argument is without merit. The contract specified that these items would be furnished *at closing*.  Since this contract has not yet closed, performance is not yet due.

obligations under contract three by the January 30 deadline, when the contract expired by its own terms. Roundville claims that it assumed, by the parties' actions that the contract had been extended, but in fact the Joneses never signed the extension agreement prepared by Elder. The only dispute is whether the actions of the Joneses *prevented* Roundville from tendering performance. Roundville has not established that the Joneses prevented it from actual tender of performance within the time specified.

The acts Roundville complains of as preventing it from tendering performance under contract three do not establish that it was in fact prevented from performing its obligations. There were no contrary facts for the district court to consider. Rather, the dispute is in the conclusion that the actions complained of did or did not prevent Roundville from tendering performance. Because there is only one version of the facts on the pivotal point of whether the Joneses prevented Roundville from tendering performance, we cannot say that the district court's judgment is clearly wrong or unjust. These convoluted negotiations appear to have produced an inequitable result, but under the facts presented, Roundville is not entitled to the remedy of specific performance. We hold that the evidence is legally and factually sufficient to support the district court's findings and conclusions that Roundville is not entitled to specific performance. Issue one is overruled. Because we hold that the trial court did not err in holding that Roundville was not entitled to specific performance, it is unnecessary to reach issues two, three, and four.

### *Breach of Contract*

In its fifth issue, Roundville argues that the trial court erred in its failure to find that the Joneses breached contract three. The elements of a breach of contract claim are: (1) the existence

14

of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from the breach. *National W. Life Ins. Co. v. Rowe*, 86 S.W.3d 285, 297 (Tex. App.—Austin 2002, pet. filed). Because we have held that Roundville did not tender performance and its tender was not prevented by the Joneses, its breach of contract claims also fails. We overrule issue five.

### *Attorney's Fees*

In its sixth issue, Roundville claims it conclusively established its entitlement to attorney's fees. However, in order to be entitled to attorney's fees, a party must prevail on its suit based on a written contract. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 1997). Because Roundville has not prevailed on any of its claims, it is not entitled to attorney's fees. Issue six is overruled.

### CONCLUSION

Having overruled Roundville's issues, we affirm the judgment of the trial court.

_____

David Puryear, Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed: August 29, 2003

15