Affirmed and Majority and Dissenting Opinions filed June 29, 2006









Affirmed and Majority and Dissenting Opinions filed
June 29, 2006.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00056-CV

____________

 

JAMES AND PATRICIA CHAPMAN, Appellants

 

V.

 

DOUG AND ELEANOR OLBRICH, Appellees

 

 

 

On Appeal from the 157th District Court

Harris County, Texas

Trial Court Cause No. 02-36479

 

 

 

M A J O R
I T Y   O P I N I O N

            Appellants
James and Patricia Chapman, sellers under a real estate sales contract, appeal
the trial court’s judgment in favor of the buyers, appellees Doug and Eleanor
Olbrich. Based on a unanimous jury’s findings, the trial court exercised its
equitable powers to award the Olbrichs specific performance on their contract
to purchase real property from the Chapmans.  The main issue on appeal is
whether there is legally sufficient evidence to support an award of specific
performance to the Olbrichs.  We conclude that there is legally sufficient
evidence to support the trial court’s grant of specific performance. Because the
Chapmans’ other issues lack merit, we affirm the trial court’s judgment. 








I.    Factual and Procedural Background

            The Chapmans
owned three lots in the Timberlakes Estate subdivision.  In 1999, the Olbrichs
purchased a lot adjacent to the Chapmans’ property.  On Easter Sunday of 2002,
the Olbrichs learned the Chapmans were interested in selling their property and
moving elsewhere.  

            On April 3,
2002, the Olbrichs, interested in purchasing one of the Chapmans’ three lots,
wrote the Chapmans a letter offering to purchase Lot 21 for $20,000 cash.  The
Chapmans stated that they had no immediate plans to do anything other than keep
the lot vacant.   After the Chapmans expressed interest in selling Lot 21, Mr. Olbrich drew up an earnest money contract.  Both parties signed this contract,
and the Olbrichs deposited $1,000 as earnest money with the North American
Title Company. 

            On May 3,
2002, the Olbrichs had a survey done on Lot 21 and on their own property.  The
survey revealed that the boundary line for Lot 21 went through the swimming
pool on the Chapmans’ property.   On May 5, 2002, Mr. Olbrich notified Mrs.
Chapman of this discovery.   Mr. Olbrich testified that at this point Mrs.
Chapman indicated that she intended to remove the swimming pool, which was overgrown
with wisteria and lily pads, because it was an eyesore inhibiting the sale of
the Chapmans’ house. 

            When Mrs. Chapman told
Mr. Olbrich that it would be very expensive to remove the pool, he suggested
that she remove the pool’s top coping, punch holes in its bottom to prevent
buoyancy if rain water soaked into the ground, and fill the pool with dirt.[1]  
Mrs. Chapman responded that she would deal with the pool but did not know how
long it would take.  Although the closing was set for May 25, Mr. Olbrich
suggested they extend the closing date to give the Chapmans time to resolve the
pool issue.  Mr. Olbrich drew up an addendum (dated May 14, 2002) to the
contract, extending the closing date to June 9, 2002.

            On Friday, June 7, Mr.
Olbrich approached Mrs. Chapman and suggested that they close that same
afternoon.  Mrs. Chapman responded that she needed more time to finish the pool
project, to which Mr. Olbrich replied that she could have all the time she
needed.  Mr. Olbrich observed workers with backhoes and large equipment working
on the pool until June 23, 2002, after which he saw nobody at the Chapmans’
house.  Mr. Olbrich tried to call the Chapmans, but no one answered.  

            In the meantime, Mrs.
Chapman contracted to sell all three lots to Jorge and Yuwandee Medrano.  Mr.
Medrano testified that he became familiar with the property in June 2002, when
he visited a neighbor of the Chapmans.  Mr. Medrano did not go into the
Chapmans’ home, but he talked to Mrs. Chapman, who was outside mowing the
yard.  Mr. Medrano testified that Mrs. Chapman informed him she could not sell
him the house until after July 1, 2002.  On July 2, 2002, Mr. Medrano returned
with his wife to look at the property and thereafter entered into a contract to
buy all three lots from the Chapmans. 

            On July 15, Mr. Olbrich
spoke to Mrs. Chapman.  Unaware of the Chapmans’ intention to sell the property
to someone else, Mr. Olbrich inquired about the progress on the pool.  Mrs.
Chapman informed Mr. Olbrich that “[t]he contract is over” and that the
Chapmans had contracted to sell the property to somebody else.

            Mr. Olbrich immediately
called his attorney and then wrote to the title company, stating that the
Olbrichs intended to enforce their contract by specific performance:

Pursuant
to the Contract of Sale between James and Patricia Chapman, the Sellers, and
Doug and Eleanor Olbrich, the Buyers, for Lot 21, Block 8, Section 1,
Timberlake Estates, Harris County, Texas, the Property, dated April 19, 2002,
and Addendum No. 1, dated May 1, 2002, the Sellers have failed to comply with
the contract as agreed and are in default.

As
provided under Section 15, DEFAULT, (a) “the Buyer may enforce specific
performance, seek such other relief as may be provided by law, or both”. [sic]
Buyer intends to enforce specific performance of the contract and wishes to
proceed with immediate closing.

The Olbrichs sent the
Chapmans a copy of this letter.

            The next day,
July 16, 2002, the Olbrichs wrote the Chapmans, informing them that they were
claiming specific performance and demanding an immediate closing, after which
the Olbrichs would contract for the removal of the swimming pool “with
reimbursement to [the Olbrichs] of associated expenses and any attorney fees.” 
The Olbrichs offered to meet with the Chapmans for mediation within two days;
after that time, the Olbrichs planned to file a lis pendens on the property.  

            The Olbrichs
received no reply to the July 15 and 16 letters.  On July 20, 2002, Mrs.
Olbrich wrote Mrs. Chapman and offered to purchase Lot 21, reduced in size by
3,325 square feet so that the swimming pool would be entirely located on the
Chapmans’ property, for the original $20,000 purchase price.  The Chapmans
failed to respond to the July 20 offer.

            On July 22,
2002, the Olbrichs sued the Chapmans for breach of contract, seeking specific
performance and attorney’s fees.  In their petition, the Olbrichs stated that
they “here [sic] tender their performance and undertake to do such things and
pay such amounts as required by the contract, the law, and the orders of this
Court.  They offer to do equity.”  On July 26, 2002, the Olbrichs filed a
notice of lis pendens on the property.  

            The Chapmans
filed a counterclaim in which they sought a declaratory judgment that the
contract was terminated or expired on or before June 9, 2002.  They also sought
attorney’s fees.  

            The Chapmans
and the Medranos closed on the sale of the Chapmans’ property on August 8 or 9,
2002.[2] 
At the time of trial, the Medranos still owned, and were living on, the
property they purchased from the Chapmans.  

            The jury
found that the Chapmans had failed to comply with their agreement to sell Lot 21 to the Olbrichs and that their failure to comply was not excused.  The jury awarded
attorney’s fees totaling $55,000 for trial and appeals.  

            In its final
judgment, the trial court awarded the Olbrichs specific performance and ordered
that Lot 21 be vested in the Olbrichs and “divested from any person claiming
the same since July 1, 2002, including the Defendants, James and Patricia Chapman,
and their purchasers of Lot 21 . . . Jorge S. and Yuwadee S. Medrano.”  The
trial court also ordered the Chapmans to sign a release of escrow to North
American Title Company in favor of the Olbrichs for release of their $1,000
earnest money.  The trial court further ordered that the $20,000 purchase price
of Lot 21 be applied to the Olbrichs’ award of attorney’s fees and that the
Olbrichs recover the remaining $35,000 from the Chapmans, with the amounts for
appeals credited if no appeal were filed in the court of appeals or the Texas
Supreme Court.

II.  Issues Presented

            In their issues on appeal, the
Chapmans assert the trial court erred as follows: 

(1)–(2)           in denying the Chapmans’ motions for
directed verdict and for judgment notwithstanding the verdict and in awarding
the Olbrichs specific performance because the contract allegedly terminated in
accordance with its own terms when the Chapmans could not cure the pool
encroachment revealed by the survey. 

(3)–(4)           in denying the Chapmans’ motions for
directed verdict and judgment notwithstanding the verdict and in awarding the
Olbrichs specific performance because the Olbrichs allegedly never tendered
their own performance under the contract and, in fact, tendered only a
nonconforming performance. 

(5)                   in excluding from evidence the
Olbrichs’ response to the Chapmans’ requests for disclosure. 

(6)                   in offsetting
the purchase price of Lot 21 against the attorney’s fees awarded to the
Olbrichs because the property allegedly was part of the Chapmans’ homestead,
making the sale proceeds from the property protected from creditors’ claims.

II. Analysis

            A.        Did the
contract terminate in accordance with its own terms when the Chapmans failed to
fix the pool encroachment revealed by the survey? 

            In their first
two issues, the Chapmans assert that the trial court erred in  awarding the
Olbrichs specific performance and in denying their own motions for directed
verdict and for judgment notwithstanding the verdict on the basis that the
contract terminated in accordance with its own terms.

            At any course
of trial proceedings, judgment without or against a jury verdict is proper only
when the law does not allow reasonable jurors to decide otherwise.  City of Keller v. Wilson, 168 S.W.3d 802, 823 (Tex. 2005).  The test for legal sufficiency is
the same for directed verdicts and judgments notwithstanding the verdict.  Id.  When reviewing the legal sufficiency of the evidence, we review the evidence in
the light most favorable to the challenged finding and indulge every reasonable
inference that would support it.  Id. at 822.  We credit favorable
evidence if a reasonable factfinder could, and disregard contrary evidence
unless a reasonable factfinder could not.  Id. at 827.  The evidence is
legally sufficient if it would enable fair-minded people to reach the verdict
under review.  Id.  

             In
construing contracts, our primary concern is to ascertain and give effect to
the intentions of the parties as expressed in the contract.  Kelley-Coppedge,
Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998).  To ascertain
the true intentions of the parties, we examine the entire contract in an effort
to harmonize and give effect to all of its provisions so that none will be
rendered meaningless.   MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,
995 S.W.2d 647, 652 (Tex. 1999).   When a written contract is so worded that it
can be given a certain or definite legal meaning or interpretation, it is not
ambiguous, and the court construes it as a matter of law.  American Mfrs.
Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154, 157 (Tex. 2003).   A contract is
ambiguous when its meaning is uncertain and doubtful or is reasonably
susceptible to more than one interpretation.   Heritage Res., Inc. v.
NationsBank, 939 S.W.2d 118, 121 (Tex.  1996).  

            The Chapmans contend that the
contract terminated on June 9, 2002 in accordance with  Paragraph 6.B. because
the Olbrichs objected to the swimming-pool encumbrance revealed by the
survey and the Chapmans failed to cure this defect within fifteen days of
receiving the objection.  Paragraph 6.B. of the contract states in full as
follows: 

            B.        SURVEY: (Check one box only)

                        ■          (1)       Within
__5__days after the Buyer’s receipt of a survey furnished to a
third-party lender at □ Seller’s ■ Buyer’s expense, Buyer may
object in writing to any matter shown on the survey which constitutes a defect
or encumbrance to title. 

                        □          (2)       Within___days
after the effective date of this contract, Buyer may object in writing to any
matter which constitutes a defect or encumbrance to title shown on a survey
obtained by Buyer at Buyer’s expense. 

The survey
must be made by a Registered Professional Land Surveyor acceptable to the Title
Company and any lender.  Utility easements created by  the dedication deed and
plat of the subdivision in which the Property is located will not be a basis
for objection. 

Buyer may
object to existing building and zoning ordinances, items 6A(1) through (8)
above and matters shown on the survey if Buyer determines that any such
ordinance, items or matters prohibits the following use or activity:   N/A               
.

Buyer’s failure to object under Paragraph 6A or 6B
within the time allowed will constitute a waiver of Buyer’s right to object;
except that the requirements in Schedule C of the Commitment will not be deemed
to have been waived.  Seller shall cure the timely objections of Buyer or any
third party lender within 15 days from the date Seller receives the objections
and the Closing Date will be extended as necessary.  If objections are not
cured by the extended Closing Date, this contract will terminate and the
earnest money will be refunded to Buyer unless Buyer elects to waive the
objections. 

(blanks in original,
emphasis added).   As indicated above by the shaded box, Paragraph 6B(1)
applies to the facts of this case.  

            Within days
after the Olbrichs’ survey revealed that the boundary line for Lot 21 went through the swimming pool on the Chapmans’ property, Mr. Olbrich presented the
Chapmans with “Addendum No. 1 ” requesting that the Chapmans remove the
encumbrance and extend the closing date from May 25, 2002 to June 9, 2002. 
They agreed.  The Chapmans now maintain that this addendum constituted a
written objection to the encumbrance (based on the survey) because it was delivered
five days after the date the survey was completed and extended the closing date
fifteen days past the original closing date of May 25, 2002.   Thus, the
Chapmans argue that because the Olbrichs objected to the encumbrance and the
Chapmans failed to cure the objections within fifteen days, the contract
terminated in accordance with its own terms on June 9, 2002, extinguished all
duties owed by either party, and precluded enforcement of the contract by
specific performance. 

            The Olbrichs
make two arguments in response.  First, they contend that “Addendum No. 1 ” did
not constitute an objection to a defect or encumbrance to title shown on a
survey. Second, they contend that Paragraph 6.B does not apply because there
was no third-party lender to furnish a survey to the Olbrichs (as the sale was
a cash transaction), thus the Olbrichs did not have the power to object under
Paragraph 6.B(1).[3] 


            We conclude
that “Addendum No. 1 ” does not constitute an objection to a defect or
encumbrance to title shown on the Olbrichs’ survey.  The Chapmans maintain that
“Addendum No.1 ” was a written objection to the pool encroachment  because,
consistent with the contract’s provisions, it was presented exactly five days
after the date the survey was signed and gave the Chapmans fifteen days to cure
the objections.[4]  
The Chapmans then assert that because they were unable to remove the
encumbrance (although they claim they attempted to remove it in good faith),
the contract terminated on June 9, 2002.  Accordingly, the Chapmans contend
that all duties under the contract were extinguished on this date, after which
the Olbrichs had no contract upon which to base their specific performance
action.  

            Whether
“Addendum No. 1 ” was a written objection to the pool encroachment is a
question of law.  See Sw. Intelecom, Inc. v. Hotel Networks, 997 S.W.2d
322, 324 (Tex. App.–Austin 1999, pet. denied) (stating that the interpretation
of a writing is a legal matter).   To analyze the issue, we look first to the
content of “Addendum No. 1,” which states in its entirety: 

Addendum
No. 1 to the Contract of Sale between James and Patricia Chapman, the Sellers,
and Doug and Eleanor Olbrich, the Buyers, for Lot 21, Block 8, Section 1,
Timberlake Estates, Harris County, Texas, the Property, dated April 19, 2002.

Whereas
the Survey, Item 6. Title Policy and Survey, furnished by the Buyers
shows fencing and a swimming pool owned by the Sellers encroaching upon the
Property, the Sellers agree to the following.

The
Sellers will remove the top coping and pool structure to a depth of at least
one (1) foot beneath the existing land surface, puncture sufficient holes in
the bottom of the swimming pool to prevent buoyancy, and compact the void
created by the swimming pool with fill dirt to an elevation at least six (6)
inches higher than the surrounding land surface. The fencing on the Property
will be removed and retained by the Sellers. 

The
Closing Date of May 25, 2002 is extended to June 9, 2002 or sooner to allow the
Sellers time to remove fencing and abandon the swimming pool. 

            Executed on the 14 day [sic] of May, 2002.


            The addendum
was signed by both the Chapmans and the Olbrichs.  However it is not
necessarily an objection to a defect or encumbrance to title merely because it
was executed five days after the survey’s completion and extended the closing
date fifteen days.  The contract language states that the “Seller shall cure
the timely objections of Buyer or any third party lender within 15 days from
the date Seller receives the objections and the Closing Date will be extended
as necessary.”   The addendum, however, extends the closing date to June 9,
2002, or sooner, to allow the sellers (the Chapmans) time to remove the
fencing and abandon the swimming pool.  The language in the addendum does not
mirror the contract 

 class=Section3>

language.  We conclude
that “Addendum No. 1 ” is not an objection prompting application of Paragraph
6.B; rather, it is merely an addition to the parties’ contract delineating the
terms of a mutually acceptable solution to the pool and fence encroachments.
Therefore, the trial court did not err in denying the Chapmans’ motions for
directed verdict and for judgment notwithstanding the verdict based on their
argument that the contract terminated under Paragraph 6.B.

            Furthermore,
even if “Addendum No. 1 ” were an objection under Paragraph 6.B., the trial
court still would not have erred in denying the Chapmans a directed verdict and
judgment notwithstanding the verdict because Paragraph 6.B. states that it
applies only to surveys furnished to a third-party lender.

            When a
written contract is so worded that it can be given a certain or definite legal
meaning or interpretation, it is not ambiguous, and courts construe it as a
matter of law.  American Mfrs. Mut. Ins. Co., 124 S.W.3d at 157.    Neither
party argues that the contract is ambiguous.  The language of Paragraph 6.B
unambiguously allows the Olbrichs to object to  a defect or encumbrance to
title shown on a survey furnished to a third-party lender at the buyers’
expense, within five days of the Olbrichs’ receipt thereof.  The transaction
between the Chapmans and the Olbrichs did not involve a third-party lender. 
Thus, Paragraph 6.B. does not apply.  To accept the Chapmans’ argument that
“Addendum No. 1 ” was an objection under Paragraph 6.B. would require us to
read the contract as though it provided the Olbrichs the option to object upon
receipt of a survey other than the survey referenced in the contract.  However,
we interpret words in a contract according to their usual grammatical meaning,
and construe the contract as written.  Reilly v. Rangers Mgmt., Inc.,
727 S.W.2d 527, 529 (Tex.1987).   Under the contract’s plain language, the
Olbrichs could not have objected under Paragraph 6.B. and thus the “cure”
language upon which the Chapmans rely is inapplicable.[5] 
See  MCI Telecomms. Corp., 995 S.W.2d at 652 (stating that “[w]e
examine the entire agreement in an effort to harmonize and give effect to all
of the provisions of the contract so that none will be rendered meaningless”). 

            We overrule
the Chapmans’ first and second issues. 

            B.        Is there
legally and factually sufficient evidence to support a finding that the
Olbrichs were excused from tendering performance because such a tender would
have been futile?

            In their third and fourth issues, the
Chapmans argue the trial court erred in denying their motions for directed
verdict and judgment notwithstanding the verdict and in awarding the Olbrichs
specific performance because the Olbrichs never tendered their own performance
as required under the contract.  The Chapmans argue the Olbrichs tendered a
nonconforming performance and thus this tender was insufficient as a predicate
for specific performance.  The Olbrichs counter that the Chapmans had no
intention of fulfilling their obligations under the contract as demonstrated by
their sale of Lot 21 to the Medranos despite a recorded notice of lis pendens
and a lawsuit by the Olbrichs seeking specific performance.  Pointing to these
circumstances, the Olbrichs posit that any actual tender would have been futile
and, consequently, all that was required was a tender of performance in their
pleadings.  

            In analyzing
no-evidence issues, we must consider the evidence in the light most favorable
to the challenged finding and indulge every reasonable inference that would
support it.  City of Keller, 168 S.W.3d at 821.  Specific performance is
an equitable remedy committed to the trial court’s discretion.  Bell v. Rudd,
191 S.W.2d 841, 843 (Tex. 1946);   Roundville Partners, L.L.C. v. Jones,
118 S.W.3d 73, 79 (Tex. App.—Austin 2003, pet. denied).  The parties seeking
specific performance must demonstrate that they have performed, or tendered
performance, of their obligations under the contract.  American Apparel
Prods., Inc. v. Brabs, Inc., 880 S.W.2d 267, 269 (Tex. App.—Houston [14th
Dist.] 1994, no writ). Tender of performance is excused under certain
circumstances, such as when a tender would be futile or when the defendants
have repudiated the contract.  See Burford v. Pounders, 199 S.W.2d 141,
144–45 (Tex. 1947); Henry v. Mr. M. Convenience Stores, Inc., 543 S.W.2d
393, 394–96 (Tex. App.–Houston [14th Dist.] 1976, writ ref’d n.r.e.). 

The evidence is
legally sufficient to support a finding that the Olbrichs were excused from
tendering performance because of the Chapmans’ repudiation of the contract.

            Under
precedent from the Texas Supreme Court and this court, the
tender-of-performance requirement for specific-performance claims is excused if
the defendants have repudiated the contract.   See Burford, 199 S.W.2d
at 144–45; Henry, 543 S.W.2d at 394–96. A party repudiates a contract if
the party manifests, by words or actions, a definite and unconditional
intention not to perform the contract according to its terms.  Builders
Sand, Inc. v. Turtur, 678 S.W.2d 115, 120 (Tex. App.—Houston [14th Dist.]
1984, no writ).

            In Burford,
defendant Beaird leased property to plaintiff Burford. The lease required
Beaird to give Burford the opportunity to purchase the land before Beaird sold
the property to anyone else.  Without giving Burford this opportunity, Beaird
sold the property to a third party.  Burford, 199 S.W.2d at 142.  The
court recognized that a tender by Burford in this situation would have been a
“useless act” or “idle ceremony.”  Burford, 199 S.W.2d at 144–45.  
Because “Beaird put himself in an attitude of default, and repudiated the
contract by selling to Pounders,” the Texas Supreme Court held Burford was not
required to tender the purchase price and instead could rely on Burford’s offer
in his pleadings to “do equity.” Id. at 145. 

            The Olbrichs
were not required to tender the purchase price because the Chapmans had “put it
out of [their] power to perform” by repudiating the contract.  See id.
The Chapmans entered into a binding contract to sell the property in question
to the Medranos on July 2, 2002.  This contract makes no reference to the
Olbrichs or their contract with the Chapmans.  Mrs. Chapman informed Mr.
Olbrich on July 15, 2002, two weeks after contracting with the Medranos, that
“[t]he contract is over” and that the Chapmans had contracted to sell the
property to another party.

            Although the
Olbrichs did not make a formal tender of performance, they were not required to
do so.  The evidence presented at trial would enable reasonable and fair-minded
people to find that the Olbrichs were excused from tendering performance by the
Chapmans’ repudiation of their contract.  There is legally sufficient evidence
on this basis alone to support a finding that the Olbrichs were not required to
make an actual tender of performance.  See Burford, 199 S.W.2d at 145; see
also Glass v. Anderson, 596 S.W.2d 507, 513 (Tex. 1980) (holding that
buyer’s repudiation of contracts to buy real property from seller excused
seller from his obligation to tender performance); 17090 Parkway, Ltd. v.
McDavid, 80 S.W.3d 252, 255–57 (Tex. App.–Dallas 2002, pet. denied)
(holding that tender of performance was excused because seller repudiated the 
contract to sell the real estate); Hubler v. Oshman, 700 S.W.2d 694, 698
(Tex. App.—Corpus Christi 1985, no writ) (holding buyer was relieved of his
obligation to tender his performance to seller because of seller’s repudiation
of the contract);  Brantley v. Etter, 662 S.W.2d 752, 758 (Tex. App.—San
Antonio 1983, writ ref’d n.r.e.) (holding tender of performance was excused in
specific-performance case because sellers repudiated contract by declaring
their intention not to perform it); Henry, 543 S.W.2d at 394–96
(concluding that because the contract between Mrs. Henry and Mr. M had been
“effectively repudiated” by the conveyance of Mrs. Henry’s legal title and by
the placement of the restriction on the property, Mr. M was excused from
formally tendering performance at closing). 

The
evidence is legally sufficient to support a finding that the Olbrichs were
excused from tendering performance because such a tender would have been
futile.

            Tender of
performance is also excused when a tender would be a useless act.  Burford,
199 S.W.2d at 145; Wilson v. Klein, 715 S.W.2d 814, 821 (Tex. App.–Austin
1986, writ ref'd n.r.e.) (stating that actual tender of purchase price, as a
prerequisite to equitable remedy of specific performance, is forgiven and a
constructive tender will suffice, when acts of defendant or situation of
property is such that an actual tender would have been “a useless act, an idle
ceremony or wholly nugatory”).  There is evidence that the Chapmans repudiated
the contract.  They told the Olbrichs that it was no longer in effect, 
contracted to sell the same property to the Medranos, and closed on this sale
with the Medranos despite the pendency of this lawsuit and a recorded lis
pendens.  Even after being told the contract was “over” and that the Chapmans
had decided to sell the property to another party, the Olbrichs still offered
to close and proposed various ways to proceed with the sale.  Indeed, on July
20, 2002, the Olbrichs offered to pay for a survey not required by the contract
and to close, paying the $20,000 contract price in exchange for title to only
17,500 square feet of the 20,825 square feet covered by the contract.[6]  
This proposal would have allowed the Chapmans to retain title to the area in
which the pool was located and enabled them to avoid the expense of filling in
the pool as required by the contract.  If the Chapmans’ past repudiation of the
contract left any doubt as to whether tender of performance under the exact
contract terms would have been futile, the Chapmans’ refusal to close on terms
much more favorable to them is clear and compelling evidence that tendering
performance under the contract terms would have been a useless act.  Therefore,
reasonable and fair-minded people could find that the Olbrichs were excused
from tendering performance because such a tender would have been futile.[7] 
See Burford, 199 S.W.2d at 144–45.  Consequently, the trial court did
not err in ordering specific performance in this case or in denying the
Chapmans’ motions for directed verdict and judgment notwithstanding the verdict
based on the argument that the Olbrichs never tendered performance.[8] 
We overrule the Chapmans’ third and fourth issues.

            C.        Did the trial court abuse its
discretion in refusing to admit the Olbrichs’ response to requests for
disclosure into evidence? 

            In their fifth issue, the Chapmans
contend that the trial court erred in excluding Defendants’ Exhibit 5 from
evidence.  The Chapmans claim that this exhibit was the Olbrichs’ response to
the Chapmans’ requests for disclosure under Texas Rule of Civil Procedure 194. 
There was an issue at trial as to whether the contract terminated based on the
Chapmans’ failure to cure the Olbrichs’ alleged objection under Paragraph 6.B. 
The Chapmans asserted that the “Addendum No. 1 ” to the contract constituted
such an objection.  However, because Mr. Olbrich denied making such an
objection at trial, the Chapmans sought to read to the jury and offer into
evidence the Olbrichs’ responses to requests for disclosure, which the Chapmans
claim contradict this testimony by describing encroachments on the property in
question.  The trial court sustained the Olbrichs’ objection and refused to
allow these responses into evidence or to be read to the jury.

            Our appellate record does not contain
Defendants’ Exhibit 5.  After the close of evidence but before closing
arguments, the Chapmans, outside the presence of the jury, made the following
offer of proof: 

            Judge,
we had intended to offer during trial the plaintiff’s response to Rule
194.2c. [sic] C is requests [sic] for disclosure, and I would like to read that
into the record at this time. This is—this is the response that we had intended
and had requested to offer to the jury in this trial.

            194—the
request Rule 194.2c requests [sic] that the plaintiffs state: The legal
theories and, in general, the factual bases of the responding party’s claims or
defenses, (the responding party need not marshall all evidence that may be
offered at trial). 

            The
plaintiffs’ response was: Plaintiffs entered into a written contract with
Defendants for the purchase from Defendants of Lot 21 of Block 8 of Timberlake
Estates in Harris County, Texas (the “Property”). Encroachment [sic] owned by
Defendants were found to exist upon the Property.  Defendants agreed to remove
the encroachments on the Property and assured Plaintiffs that they were progressing
with removal of the encroachment.  

            However,
Defendants refused to remove the encroachments on the property as they had
agreed and refused to perform under the contract for the sale of the Property. 

            Further,
Defendants have sold the Property to a third party in breach of their agreement
to sell to Plaintiffs.

            Judge, that completes our offer. That was
the response that we had wanted to read to the jury. 

(emphasis added).  
During this offer of proof, the Chapmans did not tender the document in question
to the trial court, nor did they identify the responses in question as the
same  as those contained in Defendants’ Exhibit 5.  Given that the trial court
previously had denied the Chapmans’ request that Defendants’ Exhibit 5 be
admitted into evidence and read to the jury, the Chapmans’ offer of proof seems
to indicate that the responses read by counsel  differed from those in
Defendants’ Exhibit 5 because counsel stated that the Chapmans “had intended to
offer during trial” the responses described in the offer of proof.  Further,
the offer of proof does not mention whether the responses being read were the
Olbrichs’ latest responses or responses that had been superseded or
supplemented.  This information is significant because the Texas Rules of Civil
Procedure specifically provide that “[a] response to requests under Rule
194.2(c)and (d) that has been changed by an amended or supplemental response is
not admissible and may not be used for impeachment.”  Tex. R. Civ. P.  194.6.        To adequately and effectively
preserve error, an offer of proof must show the nature of the disallowed
evidence with sufficient specificity to allow the reviewing court to determine
its admissibility. Bohatch v. Butler & Binion, 905 S.W.2d 597, 607
(Tex. App.—Houston [14th Dist.] 1995), aff’d, 977 S.W.2d 543
(Tex.1998).  Our record does not contain Defendants’ Exhibit 5—the document
that the Chapmans assert should have been admitted into evidence or read to the
jury.  The Chapmans’ offer of proof does not make it clear that the responses
read into the record are the same as those that were contained in Defendants’
Exhibit 5.  Further, the offer of proof does not describe these responses
specifically enough to allow this court to determine whether the trial court
erred.  Therefore, the Chapmans have not preserved error as to their fifth
issue.  Accordingly, we overrule the Chapmans’ fifth issue.[9]


      D.              Did the trial court err in
offsetting the purchase price of the property against the attorney’s fees
awarded to the Olbrichs?

            In their sixth issue, the Chapmans
contend that the trial court erred in offsetting the purchase price of Lot 21 against the attorney’s fees awarded to the Olbrichs.  In its final judgment, rather
than awarding the Olbrichs $55,000 for their attorney’s fees and ordering the
Olbrichs to pay the Chapmans $20,000 (the purchase price of Lot 21), the trial
court offset the purchase price against the award of attorney’s fees and
granted a judgment against the Chapmans stating, in relevant part:

It is
further, ORDERED, ADJUDGED, and DECREED that, after applying TWENTY THOUSAND
AND NO/100 DOLLARS ($20,000.00) (the purchase price of Lot 21), of Plaintiffs’
recovery of attorney’s fees against Defendants, that Plaintiffs, Douglas and
Eleanor Olbrich, do have and recover of and from Defendants, James and Patricia
Chapman, the sum of THIRTY-FIVE THOUSAND AND NO/100 DOLLARS ($35,000.00) as
reasonable and necessary attorney’s fees awarded by the jury to Plaintiffs, who
are the prevailing parties.   

 

            Instead of
requiring the Olbrichs to pay the Chapmans the purchase price of the land, the
trial court deducted the purchase price of the land from the attorney’s fees
award.  The Chapmans contend that this offset was made in error because the
property was part of their protected  “homestead.”   We disagree and conclude
that the Chapmans failed to establish that this property was their homestead.  

            The proceeds
from the sale of a homestead are protected only if the existence of a homestead
is first proved.  Burk Royalty Co. v. Riley, 475 S.W.2d 566 (Tex.  1972); Savell v. Flint, 347 S.W.2d 24 (Tex. Civ. App.–Eastland 1961, writ
ref’d n.r.e.) (holding that the evidence raised a fact issue as to whether
claimants lived at a new truck stop claimed as a homestead when the deed of trust
was executed); Vaughn v. Vaughn, 279 S.W.2d 427, 436 (Tex. Civ.
App.–Texarkana 1955, writ ref’d n.r.e.) (holding that in an action by widow to
require husband’s executor to set aside three tracts of land for her use as
homestead, the widow had the burden of showing that the forty-eight-acre tract
was a homestead even though it was not contiguous to land on which widow’s
residence was located and had never been farmed by husband).   

            One who
desires to avail himself of a homestead right must assert that right.  Bouldin
v. Woosley, 525 S.W.2d 276, 280 (Tex. Civ. App.–Waco 1975, no writ)
(holding that if a homestead exemption is relied upon, either as a claim or
defense, it must be pleaded and proven); Roberson v. Home Owners’ Loan
Corp., 147 S.W.2d 949, 953 (Tex. Civ. App.–Dallas 1941, writ dism’d judgm’t
cor.) (stating that “[h]omestead exemption is a right conferred by law upon the
head of a family, and unless he avails himself of the right by pleadings and
proof, courts cannot assume facts exist against the validity of an existing
debt and lien, or that the head of the family wishes to claim the
exemption.”).   Every fact that is essential to the existence of the asserted
homestead right must be established by “evidence not of [a] doubtful nature.”  Vaughn,
279 S.W.2d at 436.    Further, in order to establish homestead rights there
must be proof of concurrence of usage and intent on the part of the owner to
claim the land as a homestead.  McFarlane v. First Nat’l. Bank of Orange,
Tex., 97 S.W.2d 754, 761 (Tex. Civ. App.–Beaumont 1936, writ ref’d).  A
family is not entitled to two homesteads at the same time. Tex. Const. art. XVI, § 51; Silvers
v. Welch, 127 Tex. 58, 91 S.W.2d 686, 687 (1936).  

            The alleged
violation of the homestead exemption occurred no earlier than on the date of
judgment, November 5, 2004.  However, the record contains no evidence that the
property in question was the Chapmans’ homestead on this date.  Although the
Chapmans cite several pages of the record in an attempt to show that this
property was part of their homestead, none of these pages, nor any other pages
in the record, mention the word “homestead” or establish that the property was
the Chapmans’ homestead.  Indeed, no property records were offered to establish
the homestead exemption.  Moreover, although the Chapmans filed an objection to
the proposed final judgment stating that this property was part of their
homestead, they did not attach any evidence or an affidavit in support of this
objection.  At trial, the evidence showed that the Chapmans sold the property
in question to the Medranos along with adjoining property.  This sale closed in
August 2002, and the Medranos paid the Chapmans $150,000.  Mr.  Medrano
testified at trial that he purchased the  property in question and had been
living there for more than two years.  

            The evidence
in the record conclusively proves that the property had not been the Chapmans’
homestead for more than two years before November 5, 2004.  See Woolfolk
v. Ricketts, 48 Tex. 28, 30 (Tex. 1877) (holding that evidence that the
homestead claimants had removed their residence to another place, with nothing
to indicate that the removal was temporary, held sufficient, in favor of one
who had bought the property on the faith of it, to show that they had abandoned
it as their homestead); McIntyre v. McIntyre, 722 S.W.2d 533, 537 (Tex.
App.–San Antonio 1986, no writ) (holding that the former husband failed to
establish that the marital residence was a homestead, so as to preclude use of
proceeds from the sale of the marital residence to pay the former wife’s
attorney’s fees); Franklin v.  Woods, 598 S.W.2d946, 949 (Tex.  Civ. App.—Corpus Christi 1980, no writ) (stating “[t]here can be no more convincing
proof of the intent to abandon than a sale of the homestead”); Norman v.
First Bank & Trust, Bryan, 557 S.W.2d 797,  801–02 (Tex. Civ.
App.–Houston [1 Dist.] 1977, writ ref’d n.r.e.) (holding that removal to a
different residence and use and occupancy of it as a homestead, unaccompanied
by any act evidencing an intention to return to former home, is evidence that a
new homestead has been acquired and the old one abandoned).  Accordingly, we
overrule the Chapmans’ sixth issue. 

            Having
overruled all of the Chapmans’ issues, we affirm the trial court’s judgment. 

 

                                                                                    

                                                                        /s/        Kem
Thompson Frost

                                                                                    Justice

 

 

 

 

Judgment rendered and Majority and
Dissenting Opinions filed June 29, 2006.

Panel consists of Justices Hudson,
Frost, and Seymore.  (Hudson, J., dissenting).









[1] 
Unbeknownst to the Olbrichs, Mrs. Chapman already had received an estimate that
it would cost $10,000 to remove the pool deck and the top eighteen inches of
the pool and fill the pool with dirt.  





[2] 
The Medrano/Chapman sales contract was originally taken to North American Title
Company, the same title company that had the Olbrich/Chapman sales contract.
North American rejected the Medrano/Chapman contract, and so the Medranos and
the Chapmans had to close at another title company.  





[3] 
The Olbrichs concede that paragraph 6.B(2) may have fit the facts of this case,
but because this provision was not checked by the parties, we do not address it
as a resolution to the issues raised by the Chapmans in this appeal. 





[4] 
The Chapmans also state the Olbrichs’ responses to requests for disclosure of their
factual bases of their claims support the Chapmans’ argument that “Addendum No.
1 ” was a written objection.   The trial court excluded these discovery
responses at trial.  For disposition of this sub-issue, see the discussion of
the Chapmans’ fifth issue infra. 





[5] 
The Chapmans rely on the provision that states, “Seller shall cure the timely
objections of Buyer or any third party lender within 15 days from the date
Seller receives the objections and the Closing Date will be extended as
necessary.  If objections are not cured by the extended Closing Date, this
contract will terminate”  (emphasis added).  





[6]  The July 20, 2002
letter stated, in relevant part:

According to the survey, the lot measures 119' in
width by 175' in length, which totals 20,825 square feet.  We will agree to
resurvey the lot at our expense to take off 19' in width on the southern side. 
This will move the boundary line off of the pool and off of the septic tank,
and will add 19 more feet in width to the lot on which your house sits. . . .
Rather than asking you for an adjustment in price reflecting the reduced size
of the lot, we will maintain the original agreed-to price of $20,000.  

This offer allows you to receive your agreed-to price
for the lot and frees you up to sell your remaining property without incurring
any expense in removing encroachments.  We will also be absorbing the cost of
the new survey and the loss of square footage without any reduction in price .
. . .





[7]   Whether in the
jury’s answers to questions 1 and 2 or in deemed findings under Texas Rule of
Civil Procedure 279, we conclude there are findings that the Olbrichs were
excused from tendering performance by the Chapmans’ repudiation of the contract
and by the futility of such a tender.  See Tex. R. Civ. P. 279; In re J.F.C., 96 S.W.3d 256,
262–63 (Tex. 2002). 





[8]  Even if tender of
performance is excused, some courts have concluded that, parties seeking
specific performance must plead and prove that they are ready, willing, and
able to perform.  See, e.g., Chessher v. McNabb, 619 S.W.2d 420,
421 (Tex. App.—Houston [14th Dist.] 1981, no writ).  However, the Chapmans have
not assigned error or argued this issue on appeal, so it is not before this
court.  See Pat Baker Co. v. Wilson, 971 S.W.2d 447, 450 (Tex. 1998) (holding that courts of appeals in civil cases cannot reverse a trial court’s
judgment based on unassigned error).  Even if this issue were before us, the
Olbrichs’ petition is sufficient under a liberal construction, and Mr.
Olbrich’s trial testimony would support a finding that at all material times
the Olbrichs were ready, willing, and able to perform. 

 





[9]  Even if the offer of
proof had sufficiently described Defendants’ Exhibit 5, the record could hardly
support a conclusion that the trial court would have reversibly erred in
excluding it from evidence or precluding the Chapmans from reading it.